# EXHIBIT 2

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

ALNAMER WHOLESALE, LLC
a Michigan limited liability company,

      Plaintiff,

v

FRESHONE DISTRIBUTION SERVICES,
LLC, a Texas limited liability company,
GREAT LOOK RENOVATIONS, LLC
a Michigan limited liability company,
DYNAMIC MECHANICAL INSULATION, LLC
a Michigan limited liability company,
21740 TROLLEY INDUSTRIAL DRIVE, LLC
a Delaware limited liability company,

      Defendants.

Case No. 25-      -CB

Hon.

**Business Court**

---

STROBL PLLC
Russell G. Carniak (P35317)
Evan H. Kaploe (P75831)
Attorneys for Plaintiff
33 Bloomfield Hills Pkwy., Ste. 125
Bloomfield Hills, MI  48304
(248) 540-2300
rcarniak@strobllaw.com
ekaploe@strobllaw.com

---

*A civil action between other parties arising out of the transaction
or occurrence alleged in this Complaint has been previously filed
in the United States District Court for the Eastern District of
Michigan, where it was given Case No. 24-cv-11315 and was
assigned to Hon. Susan K. DeClereq. The action remains pending.*

*A civil action between other parties arising out of the transaction
or occurrence alleged in this Complaint has been previously filed
in the Wayne County Circuit Court, where it was given Case No.
24-007775-CB and was assigned to Hon. Edward Ewell, Jr.. The
case is no longer pending.*

## COMPLAINT

Plaintiff Alnamer Wholesale, LLC ("Alnamer"), by and through its attorneys, Strobl

PLLC, states as follows for its Complaint against Defendants FreshOne Distribution Services,

LLC ("FreshOne"), Great Look Renovations, LLC ("Great Look"), Dynamic Mechanical

Insulation, LLC ("Dynamic"), and 21740 Trolley Industrial Drive, LLC ("21740 Trolley"),

collectively referred to herein as "Defendants":

## PARTIES, JURISDICTION AND VENUE

1.      Alnamer is a Michigan limited liability company with its registered office located

at 1935 Gratiot, Detroit, Michigan 48207.

2.      Defendant FreshOne is a Texas limited liability company located at 4001 Adler

Drive, Suite 200, Dallas, Texas 75211. FreshOne's sole member is FreshOne Holdings, LLC, a

Texas limited liability company, the sole member of which is Donald Janacek, a resident of

Texas. FreshOne is authorized to conduct business in the State of Michigan, and regularly

conducts business as the operator of a frozen goods warehouse by virtue of a lease with

FreshOne. The warehouse is located at 21740 Trolley Industrial Drive, Taylor, Wayne County,

Michigan 48180 ("Warehouse").

3.      Defendant Great Look is a Michigan limited liability company with its registered

office located at 28665 Elwell Road, Belleville, Michigan 48111, and it regularly and

systematically conducts business in Wayne County, Michigan.

4.      Defendant Dynamic is a Michigan limited liability company with its registered

office located at 336 West 1st Street, Suite 113, Flint, Michigan 48502, and it regularly and

systematically conducts business in Wayne County, Michigan.

5.      Defendant 21740 Trolley is Delaware limited liability company located at 172 S. Broadway Street, White Plains, New York 10605. Upon information and belief, 21740 Trolley is a special purpose entity organized solely to own the Warehouse that is leased to FreshOne, and its members are all residents of New York.

6.      Jurisdiction is proper in the business court as this case involves a business or commercial dispute between business enterprises pursuant to MCL 600.8031 and MCR 2.112(O), the amount in controversy exceeds $25,000 exclusive of interest and attorneys' fees, and jurisdiction is otherwise proper.

7.      Venue in this Court is proper because a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated in Wayne County, Michigan, and venue is otherwise proper.

## GENERAL ALLEGATIONS

8.      Alnamer is a wholesaler of high-end seafood and other food products for sale to restaurants and other retail establishments. Due to the perishable nature of the seafood and other food stuffs, Alnamer stores its products in warehouses that are specially designed to freeze and maintain the food-grade products. One such warehouse, owned by Defendant 21740 Trolley, is located at 21740 Trolley Industrial Drive, Taylor, Michigan 48180 (previously defined as the "Warehouse").

9.      At all times relevant to this Complaint, Alnamer, as tenant, was a party to that certain Warehousing and Storage Services Agreement and Warehouse Receipt with FreshOne, as the landlord (the "Lease"). A copy of the Lease is attached as **Exhibit 1**.

3

10.     Pursuant to the Lease, Alnamer stored a variety of frozen seafood and other consumable products at the Warehouse with the understanding that in exchange for a storage fee, the seafood would be unharmed and kept as fit for human consumption.

11.     As of May 30, 2023, Alnamer was storing at the Warehouse frozen seafood and other food products weighing more than 13,482 lbs., with a total value in excess of $550,380.70 (the "Products"). An itemized inventory of all Products stored at the Warehouse as of May 30, 2023 is attached as **Exhibit 2**.

12.     Under the terms of the Lease, FreshOne agreed to store and maintain the food Products in their frozen state, to keep the Product safe and secure from theft or damage, and to release the Product when instructed to do so by Alnamer.

13.     For the warehousing services, Alnamer paid FreshOne monthly warehouse service fees.

14.     Upon information and belief, on or about July 2021, 21740 Trolley purchased the Warehouse.

15.     Upon information and belief, sometime in late 2022 or early 2023, FreshOne assumed control of the Warehouse and its operations pursuant to a written lease with 21740 Trolley, and exercised possession, custody, and control over the Products in order to provide the services and otherwise perform as required under the Lease.

16.     Pursuant to the Lease, FreshOne is considered a warehouseman as described in Article 7 of the Uniform Commercial Code ("UCC") and is subject to all obligations therein.

17.     Upon information and belief, in early 2023, 21740 Trolley, with the knowledge and consent of FreshOne, contracted with Great Look to perform repair services on the Warehouse's roof.

4

18.     Upon information and belief, with the knowledge and consent of 21740 Trolley and FreshOne, Great Look subcontracted with Dynamic Mechanical Insulation, LLC to perform some or all of the services at the Warehouse.

19.     Upon information and belief, FreshOne and/or 21740 Trolley did not investigate or otherwise act reasonably to confirm the skill, ability, and insured status of the parties hired to perform the repair and maintenance on the roof, which was directly covering the warehoused Products.

20.     Upon information and belief, FreshOne and/or 21740 Trolley failed to take reasonable and prudent precautions to protect the warehoused Products from damage that could foreseeably occur during the repair and maintenance of the roof, which was directly overhead of the Products.

21.     Instead, FreshOne and/or 21740 Trolley took no action, conducted no background verification of those performing the workman services, and otherwise acted with extreme disregard for the safety and protection of the Products of which it maintained exclusive possession, custody, and control.

22.     The intentional neglect to ensure the safety of the Products and proper oversight of the repair is particularly egregious given that the Warehouse's ceiling and roof where the repairs were performed, contained the conduits and other piping that sourced the chemicals to operate the freezers and refrigerated sections of the Warehouse.

23.     On May 30, 2023, FreshOne and/or 21740 Trolley failed to take any precautionary measures to ensure the safety of the Products and permitted a third-party to perform maintenance and/or repairs at the Warehouse without any supervision by a FreshOne representative.

5

24.     On May 30, 2023, FreshOne was storing Alnamer's Products at the Warehouse and was otherwise maintaining exclusive possession, custody, and control of the Products.

25.     FreshOne and/or 21740 Trolley did not contact or otherwise notify Alnamer of the maintenance and/or repair which would have provided Alnamer the opportunity to make arrangements, or otherwise take necessary precautions, to ensure the safety of the Products.

26.     FreshOne and/or 21740 Trolley also failed to act reasonably, and instead, wantonly disregarded the safety of Alnamer's Products by leaving the same exposed to the elements of the repairs. FreshOne intentionally failed to relocate the Products to a substitute facility as permitted under the Lease.

27.     On May 30, 2023, while performing services at the warehouse, Great Look and/or Dynamic caused the release of ammonia gas that was used for the Warehouse's cooling system.

28.     The ammonia leak at the Warehouse was a catastrophic loss as the ammonia gas spread throughout the Warehouse and contaminated the entirety of Alnamer's Product being stored.

29.     Shortly after its contamination, Alnamer's Product was quarantined by the Michigan Department of Agriculture & Rural Development ("MDARD").

30.     MDARD ultimately determined that the Products stored at the Warehouse were contaminated, unsafe, hazardous, and unfit for human consumption.

31.     As a result of the contamination of the Product while being stored at the Warehouse, and FreshOne's and/or 21740 Trolley's failure to adhere to industry standards, Alnamer has suffered substantial damages.

32.     After the contamination event, FreshOne contacted Alnamer and specifically, intentionally, and with the purpose of delaying the filing of a lawsuit, requested that Alnamer

6

submit a claim that identified the lost inventory so that FreshOne could inform its insurance carrier.

33.     At the time FreshOne requested the information from Alnamer, it knew that the policy limitations would prevent FreshOne from fully compensating Alnamer (and all other similarly situated plaintiffs) for the damaged Products.

34.     Alnamer submitted all documents requested by FreshOne including an inventory and cost of the Products stored at the Warehouse, all of which were deemed unsafe for human consumption.

35.     FreshOne further explained to Alnamer that it would facilitate claims being filed with insurance carriers for three separate companies: FreshOne, Dynamic, and 21740 Trolley. As it turned out, this was completely false and again, designed to stall any potential litigation.

36.     FreshOne was required to maintain adequate insurance coverage as set forth in paragraph 9 of the addendum to the Lease.

37.     FreshOne thereafter facilitated an agreement between Alnamer and Dynamic whereby Dynamic would pay Alnamer $165,114.30 in exchange for a release of claims. A copy of the Confidential Settlement Agreement and Release of Claims ("Settlement Agreement") is attached as **Exhibit 3**.

38.     At the time Dynamic entered into the Settlement Agreement with Alnamer, it knew that neither Dynamic nor FreshOne made any insurance claims with their respective carriers, and that no other potentially liable party had insurance coverage to compensate Alnamer for its loss.

7

39.     Dynamic and FreshOne actively and intentionally misrepresented to Alnamer that it would be made whole by virtue of the insurance claims and induced Alnamer to sign the Settlement Agreement in reliance on such misrepresented facts.

40.     Had Dynamic and FreshOne not made such misrepresentations, Alnamer would not have entered into the Settlement Agreement.

41.     Dynamic and FreshOne also omitted material information regarding the policy limits, insurance policies in place, and that other liable parties did not have insurance coverage. Had Dynamic and FreshOne disclosed this information, Alnamer would not have entered into the Settlement Agreement.

## COUNT I – BREACH OF CONTRACT
### (As against FreshOne)

42.     Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 41 of its Complaint as though fully stated and set forth herein.

43.     Pursuant to its Lease with Alnamer, FreshOne took custody, control and care of the Products owned by Alnamer, in exchange for a monthly fee.

44.     FreshOne agreed to provide Alnamer warehouse services including, but not limited to, the safe and secure storage of the Products, the exercise of reasonable care when operating and maintaining the Warehouse, and the return or release of the Products in the same condition as when received.

45.     As of May 30, 2023, the Products were under FreshOne's exclusive care, custody and control.

46.     FreshOne breached its contractual obligations to Alnamer by failing to take reasonable steps to protect and safeguard the Products, and in failing to return or release the Products in the same condition and when received.

47.     As a result of FreshOne's contractual breaches, Alnamer has suffered substantial damages in excess of $25,000, exclusive of interest, costs, and attorney fees.

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against FreshOne for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

## COUNT II – NEGLIGENCE
### (As against Great Look and Dynamic)

48.     Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 47 of its Complaint as though fully stated and set forth herein.

49.     When performing services at the Warehouse, Great Look owed Alnamer a duty of care to avoid contamination of the Products.

50.     Great Look breached its duty of care by causing the ammonia release that contaminated the Products.

51.     Great Look also breached it duty of care by failing to take reasonable steps to protect the Products from damage that was reasonably foreseeable from an ammonia release.

52.     The failures of Great Look amounted to reckless, wanton and/or willful conduct demonstrating a substantial lack of concern for whether the contamination of the Products would occur.

53.     As the direct and proximate result of Great Look's negligence and/or gross negligence, Alnamer has suffered substantial damages.

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against Great Look for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

### COUNT III – GROSS NEGLIGENCE
### (As against FreshOne)

54.     Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 53 of its Complaint as though fully stated and set forth herein.

55.     FreshOne permitted maintenance and/or repairs in the Warehouse, in the presence of food, which involved an extreme degree of risk given the potential harm to its customers and their goods.

56.     FreshOne was aware of the likelihood of harm but proceeded anyway, without attempting to notify Alnamer, move its Products to a substitute facility, or take any other prudent and reasonable precautionary measures to protect the safety of the Products. Instead, FreshOne acted with wanton and intentional disregard as described in this Complaint.

57.     FreshOne also delegated authority to an incompetent subcontractor, which involved an extreme degree of risk given the potential harm to FreshOne's customers.

58.     FreshOne proceeded anyway despite having knowledge of the likelihood of harm and substantial risks involved.

59.     FreshOne's actions described herein constitute gross negligence.

60.     As a direct and proximate result of FreshOne's gross negligence, Alnamer suffered substantial damages.

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against FreshOne for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

## COUNT IV – GROSS NEGLIGENCE
### (As against 21740 Trolley)

61.     Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 60 of its Complaint as though fully stated and set forth herein.

62.     Great Look negligently performed services at the Warehouse causing the Product's contamination.

63.     21740 Trolley failed to exercise reasonable care when selecting Great Look to perform services at the Warehouse.

64.     21740 Trolley failed to exercise reasonable care when overseeing the services of Great Look at the Warehouse.

65.     The work 21740 Trolley delegated and assigned to Great Look involved special risks and dangers if ammonia was released in the confined space of the Warehouse.

66.     The release of ammonia threatened the health and safety of all persons inside the Warehouse and further threatened the Products by potentially rendering it unfit for resale or human consumption.

67.     21740 Trolley had a nondelegable duty to Alnamer to ensure that the services at the Warehouse were performed with the requisite degree of care, and it failed to do so.

11

68.     21740 Trolley breached its duty to Alnamer when Great Look caused the ammonia release at the warehouse.

69.     As a direct and proximate result of 21740 Trolley breaches of its nondelegable duties, Alnamer suffered substantial damages.

70.     As a result, 21740 Trolley is liable for its own negligence and for the negligence of Great Look.

71.     Accordingly, 21740 Trolley is responsible for all damages suffered by Alnamer by the contamination of its Products.

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against 21740 Trolley for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

## COUNT V – FRAUDULENT MISREPRESENTATION
### (As against FreshOne and Dynamic)

72.     Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 71 of its Complaint as though fully stated and set forth herein.

73.     FreshOne and Dynamic intentionally made false representations and/or omissions of material fact and engaged in a fraudulent scheme to defraud Alnamer into entering into the Settlement Agreement with Dynamic and delaying the filing of this lawsuit.

74.     The representations were false when they were made by FreshOne and Alnamer.

75.     FreshOne and Dynamic knew that the representations were false when they were made, or FreshOne and Dynamic made them recklessly, without knowing whether they were true.

76.     FreshOne and Dynamic intended that Alnamer would rely on the representations when entering into the Settlement Agreement.

77.     Alnamer relied on the false representations by FreshOne and Dynamic.

78.     As a result of FreshOne's and Dynamic's fraudulent scheme, Alnamer suffered substantial damages.

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against FreshOne and Dynamic for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

## COUNT VI – SILENT FRAUD
### (As against FreshOne and Dynamic)

79.     Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 78 of its Complaint as though fully stated and set forth herein.

80.     FreshOne and Dynamic failed to disclose material facts regarding certain insurance policies in place and the inability to fully compensate Alnamer for its loss.

81.     FreshOne and Dynamic had actual knowledge of these facts.

82.     FreshOne's and Dynamic's failure to disclose these facts caused Alnamer to have a false impression.

83.     When FreshOne and Dynamic failed to disclose these facts, FreshOne and Dynamic knew the failure would create a false impression.

84.     When FreshOne and Dynamic failed to disclose these facts, FreshOne and Dynamic intended that Alnamer rely on the resulting false impression.

85.     Alnamer relied on the false impression.

13

86. Alnamer was substantially damaged as a result of its reliance.

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against FreshOne and Dynamic for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

## COUNT VII – INNOCENT MISREPRESENTATION
### (As against FreshOne and Dynamic)

87. Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 86 of its Complaint as though fully stated and set forth herein.

88. FreshOne and Dynamic made representations to Alnamer that resulted in Alnamer entering into the Settlement Agreement with Dynamic.

89. The representations made by FreshOne and Dynamic including, but not limited to, that at least three insurance carriers would compensate Alnamer and that executing the Settlement Agreement is the only way to make Alnamer whole, were false in fact.

90. The representations made by FreshOne and Dynamic deceived Alnamer.

91. The representations made by FreshOne and Dynamic that were relied upon by Alnamer to Alnamer's detriment and damage, are actionable, irrespective of whether FreshOne and Dynamic acted in good faith in making the representations.

92. Alnamer's loss and the damages sustained inured to the benefit of FreshOne and Dynamic.

93. Alnamer suffered substantial damages as a result of false representations made by FreshOne and Dynamic.

14

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against FreshOne and Dynamic for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

### COUNT VIII – PROMISSORY ESTOPPEL
### (As against FreshOne)

94.     Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 93 of its Complaint as though fully stated and set forth herein.

95.     FreshOne promised clearly and unequivocally that it would store, safeguard, and return or release the Products to Alnamer in the same condition as when it was received.

96.     FreshOne expected that in making these clear and unequivocal promises to Alnamer that it would induce it to enter into an agreement and that Alnamer would store its Products at the Warehouse while paying monthly warehouse service charges.

97.     In reliance on FreshOne's promises, Alnamer continued storing its Products at the Warehouse and paid the monthly warehouse services charges.

98.     Alnamer reasonably relied on FreshOne's promises when it entered into the agreement and when it continued paying FreshOne's monthly warehouse service charges.

99.     FreshOne has refused to compensate Alnamer for the contamination of the Products while in FreshOne's care, custody and control.

100.    Enforcement of FreshOne's promises to Alnamer is required to avoid injustice.

101.    As a direct and proximate result of FreshOne's breaches of its promises, Alnamer has suffered substantial damages.

15

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against FreshOne for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

## COUNT IX – UNJUST ENRICHMENT
### (As against FreshOne)

102.    Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 101 of its Complaint as though fully stated and set forth herein.

103.    By accepting Alnamer's Products for storage at the Warehouse, FreshOne agreed to provide the above-referenced warehouse services and thereby safeguard the Products from damage caused by FreshOne and/or invitees to the Warehouse, including Great Look.

104.    Alnamer compensated FreshOne in exchange for its warehouse services.

105.    Alnamer fulfilled its obligations to FreshOne by paying the monthly warehouse charges.

106.    On May 30, 2023, Great Look caused an ammonia leak in the Warehouse that contaminated the Products.

107.    FreshOne has retained all payments Alnamer made for the warehouse services, and further refuses to fully compensate Alnamer for its expected losses when the Products were contaminated while under FreshOne's care, custody and control.

108.    As a result of the foregoing, FreshOne has been unjustly enriched.

109.    It would be inequitable to allow FreshOne to retain payments made by Alnamer, and to refuse to reimburse Alnamer for the loss of its Products while under FreshOne's care, custody and control.

16

110.    Equity requires that FreshOne pay Alnamer the full value of the Products.

111.    As a result of FreshOne's inequitable conduct, Alnamer has suffered substantial damages.

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against FreshOne for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

## COUNT X – WAREHOUSEMAN'S LIABILITY
### (As against FreshOne)

112.    Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 111 of its Complaint as though fully stated and set forth herein.

113.    FreshOne operates the Warehouse for hire and for the purpose of storing refrigerated and frozen food Products.

114.    Pursuant to MCL 440.7102, FreshOne is a warehouseman.

115.    FreshOne engaged as a warehouseman on May 30, 2023 when Alnamer's Products were contaminated by the ammonia leak.

116.    As a warehouseman, FreshOne is liable for all damages for loss or injury to Alnamer's Products caused by its failure to exercise reasonable care.

117.    FreshOne failed to exercise reasonable care by allowing Great Look into the Warehouse after which it caused the ammonia leak that contaminated the Products.

118.    When Great Look caused the ammonia leak, FreshOne negligently failed to exercise such care over it and over Alnamer's Products as a reasonably careful warehouseman would exercise under similar circumstances to avoid contamination of the Products.

17

119.   As the direct and proximate result of FreshOne's violations of its duties, Alnamer has suffered substantial damages.

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against FreshOne for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

## COUNT XI – CIVIL CONSPIRACY
### (As against FreshOne and Dynamic)

112.   Alnamer hereby incorporates and re-alleges by reference each and every allegation contained in paragraphs 1 through 111 of its Complaint as though fully stated and set forth herein.

113.   Defendants FreshOne and Dynamic, being two or more persons, acted in combination through a concerted action to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by lawful means.

114.   The underlying separate, actionable torts that support the civil conspiracy are fraudulent misrepresentation, silent fraud, and innocent misrepresentation, as set forth in this Complaint and incorporated herein.

115.   As a direct and proximate result of the civil conspiracy by FreshOne and Dynamic, Alnamer suffered substantial damages.

18

WHEREFORE, Plaintiff Alnamer respectfully requests this Honorable Court enter a judgment in its favor and against FreshOne for all damages to be proven at trial in an amount of at least $25,000 plus interest, costs and attorney fees incurred in this action, and any other relief the Court deems just and appropriate.

Respectfully submitted,

**STROBL PLLC**

By: _/s/ Russell G. Carniak_
Russell G. Carniak (P35317)
Evan H. Kaploe (P75831)
Attorneys for Plaintiff
33 Bloomfield Hills Pkwy., Ste. 125
Bloomfield Hills, MI 48304-2376
(248) 540-2300

Dated: August 11, 2025

# EXHIBIT 1

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

ALNAMER WHOLESALE, LLC
a Michigan limited liability company,

       Plaintiff,

v

FRESHONE DISTRIBUTION SERVICES,
LLC, a Texas limited liability company,
GREAT LOOK RENOVATIONS, LLC
a Michigan limited liability company,
DYNAMIC MECHANICAL INSULATION, LLC
a Michigan limited liability company,
21740 TROLLEY INDUSTRIAL DRIVE, LLC
a Delaware limited liability company,

       Defendants.

Case No. 25-    -CB

Hon.

**Business Court**

---

STROBL PLLC
Russell G. Carniak (P35317)
Evan H. Kaploe (P75831)
Attorneys for Plaintiff
33 Bloomfield Hills Pkwy., Ste. 125
Bloomfield Hills, MI 48304
(248) 540-2300
rcarniak@strobllaw.com
ekaploe@strobllaw.com

---

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury of all issues so triable as contained in Plaintiff's Complaint.

Respectfully submitted,

**STROBL PLLC**

By: _/s/ Russell G. Carniak_
Russell G. Carniak (P35317)
Evan H. Kaploe (P75831)
Attorneys for Plaintiff
33 Bloomfield Hills Pkwy., Ste. 125
Bloomfield Hills, MI 48304-2376
(248) 540-2300

Dated: August 11, 2025

*S&B\38068\001\COMPLNT\SB913864.DOC

2

# EXHIBIT 2

| Name | Description | Sum of On Hand | Cost per Case | Total |
|---|---|---|---|---|
| BWF2-4 | 2/4 SP BLK SO PBI WHTNG FLT | 49 | 90 | 4410 |
| CFF31 | Catfish Flt Sknls Bnls 3-5Oz | 466 | 80.25 | 37396.5 |
| CFF5-7 | Catfish Flt Sknls Bnls 5-7Oz | 56 | 58.5 | 3276 |
| COD3 | Cod Loin 3Oz | 110 | 54.9 | 6039 |
| CTS31-40 | 31-40 EXP S/ON SHRIMP CRYSTAL TIDE | 39 | 84 | 3276 |
| GP600-800 | Golden Pompano Lg(700 Up) | 378 | 102 | 38556 |
| Grand Total | | 7921 | | |
| KFS10-12 | King Fish Steaks 10/12oz | 151 | 54.5 | 8229.5 |
| LT3-4 | 3-4Oz Tails Raw B | 216 | 210 | 45360 |
| ORR2-4 | Orange Roughy Fillet 2-4 IQF | 95 | 151.0151 | 14346.43 |
| OYS10 | Oysters -Breaded | 250 | 58 | 14500 |
| PD116-20 | Shrimp Tail On 16-20 | 392 | 58.5 | 22932 |
| PD26-30 | Shrimp Tail Off 26-30 | 186 | 48.5 | 9021 |
| PD31-40 | Shrimp Tail On 31-40 | 1114 | 41.5 | 46231 |
| PIK | Whole Pickerel | 30 | 159 | 4770 |
| RED1-2 | Red Snapper 1.5-2 Bee Gee | 125 | 57.5 | 7187.5 |
| SCL8 | Snow Crab 8 And Up | 108 | 568.5 | 61398 |
| SCQ8-10 | 8-10OZ SNOW CRAB QUEBEC SECTION | 100 | 568.5 | 56850 |
| SFF3-5 | Swai Fillet 3-5Oz | 1 | 33.75 | 33.75 |
| SFF7-9 | Swai Fillet 7-9Oz | 390 | 33.75 | 13162.5 |
| SFF9 | Swai Fish Fillet 9-11 IQF | 89 | 33.75 | 3003.75 |
| SOIH | Smelt Whole | 96 | 52 | 4992 |
| TFF2-3 | Tilapia Flt Skls Bnls 2-3Oz | 2119 | 23 | 48737 |
| TFF3-5 | Tilapia Flt Skls Bnls 3-5Oz | 234 | 23.5 | 5499 |
| TFF5-7V | Tilapia Flt Skls Bnls 5-7Oz | 354 | 24.5 | 8673 |
| TFW550 | Wht Emp Scld 550-750G | 100 | 92 | 9200 |
| TFW750 | Wht Emp Scld 750-950G | 158 | 102 | 16116 |
| TFW950 | Wht Emp Scld 950+G | 440 | 100 | 44000 |
| WBF | White Bass Whole | 60 | 180 | 10800 |
| WMED | Walleye Med | 15 | 159 | 2385 |
| | | | | 550380.9 |

# EXHIBIT 3

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This confidential settlement agreement and release of all claims ("Agreement") entered into effective on the _____ day of May, 2024 between ALNAMER WHOLESALE ("Alnamer"), on the one hand, and DYNAMIC MECHANICAL INSULATION, LLC ("Dynamic"), on the other hand (each may be individually referred to as a "Party" and collectively as the "Parties").

### RECITALS

A.    ALNAMER WHOLESALE alleges damages against DYNAMIC associated with an ammonia leak incident at the Detroit Cold Storage facility (21740 Trolley Industrial Drive, Taylor, Michigan (the "Facility")) which is alleged to have occurred on or about May 30, 2023 (referred to as the "Incident").

B.    The Parties hereto desire to resolve all controversies and alleged claims by or that could have been brought by Alnamer Wholesale against Dynamic (as defined herein), only, as relate to the Incident.

Therefore, in consideration of the foregoing recitals and the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree to the following terms and conditions:

### IDENTIFICATION OF PARTIES:

ALNAMER WHOLESALE is defined to include itself and all affiliated companies, parent, owners, agents, servants, officers, former officers, directors, shareholders, insurers, heirs, assigns and employees, and each of their agents, servants, officers, former officers, directors, shareholders, managers, members, insurers, TPAs, assigns, subcontractors, contractors, independent contractors, attorneys and are hereinafter referred to as "Alnamer."

1

M.A.

DYNAMIC MECHANICAL INSULATION, LLC is defined to include itself, all affiliated companies, owners, agents, servants, officers, former officers, directors, shareholders, insurers (to and including Selective Insurance Company of America and Selective Insurance Company of the Southeast solely in their respective capacities as insurers of DYNAMIC MECHANICAL INSULATION, LLC), heirs, assigns and employees, and each of their agents, servants, officers, former officers, directors, shareholders, managers, members, insurers, TPAs, assigns, subcontractors, contractors, independent contractors, attorneys and are hereinafter referred to as "DYNAMIC."

The owners landlords of the Facility, the prime contractor Great Look Renovations, LLC and any other contractor or sub-contractor (other than DYNAMIC MECHANICAL INSULATION, LLC) who worked on or at the Facility or who were involved in the Incident, along with Fresh One and its agents, insurers, brokers are expressly excluded from the defined term "DYNAMIC" hereunder.

<strong>TERMS:</strong>

**Section 1.     Settlement Payment.**

Within twenty-one (21) days of execution of this Agreement and receipt of a completed W9 for ALNAMER WHOLESALE, DYNAMIC, via DYNAMIC'S carrier, shall pay to ALNAMER the total sum of One Hundred Sixty Five Thousand One Hundred Fourteen Dollars and 30/100 ($165,114.30) via check, representing immediately available funds, made payable to **ALNAMER WHOLESALE** (the "Settlement Payment").

**Section 2.     Release of All Claims Against DYNAMIC as Related to the Subject Incident.**

As a material consideration for entering into this Agreement, and in consideration of the good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged,

M.A.

ALNAMER, its heirs, executors, administrators, representatives, agents, successors and assigns, does hereby release, acquit and forever discharge and hold harmless DYNAMIC, together with its insurers Selective Insurance Company of America Selective Insurance Company of the Southeast (solely in their respective capacities as insurers of DYNAMIC MECHANICAL INSULATION, LLC) and all owners, directors, officers, operators, agents, employees, contractors, servants, users, insurers, underwriters, successors, assigns, employees, surveyors, adjusters, attorneys, heirs, executors, administrators, firms, corporations, associations, parents, subsidiaries, and partnerships of each of the foregoing, of and from any and all claims, cross-claims, third-party claims, indemnification, subrogation, demands, actions, causes of actions of whatsoever kind and nature, including without limitation, damages, costs, expenses, injuries, death, disabilities, pain and suffering, attorneys' fees, compensation and obligations, whether based on tort, contract, or other theory of recovery and whether for compensatory or punitive damages, whether at law, or in equity, and whether presently known or unknown, which ALNAMER now has, ever had, or which hereafter may arise against DYNAMIC out of any and all known and unknown, foreseen and unforeseen claims, attorney's fees, costs and the consequences thereof, whether legal or equitable, whether known or unknown, which resulted from or could have resulted from the claimed Incident, or as asserted by ALNAMER against DYNAMIC. This release includes a blanket release of all claims that ALNAMER has asserted or could have asserted, or could have been asserted on ALNAMER'S behalf, or any claim, including derivative claims by ALNAMER, related to the Incident at issue at any time against DYNAMIC only as relates to the Incident identified herein.

For clarity and the avoidance of any doubt or uncertainty, the Parties agree and acknowledge that nothing in this Agreement releases any of the following (collectively referred to as "Excluded Claims"):

M.A.

Any claims ALNAMER has, ever had, or ever may have, (i) against the owners or landlords of the Facility, or (ii) against the prime contractor Great Look Renovations, LLC or any other contractor or sub-contractor (other than DYNAMIC) who worked on or at the Facility or who was involved in the Incident, or (iii) against Fresh One; or (iv) against Fresh One's insurance carriers, agents, brokers or TPA's arising under Fresh One's insurance policies, with respect to the Incident; or (v) against any other agents, carriers, TPA's associated with any entities other than DYNAMIC.

This Agreement is effective as a full and final accord and satisfaction and general release of all claims, debts, damages, liabilities, demands, obligations, costs, expenses, disputes, actions or causes of action, known or unknown, suspected or unsuspected, by ALNAMER as outlined herein with respect to DYNAMIC as defined herein (but not any Excluded Claims defined above). The Parties to this Agreement shall not seek to recover from each other any costs or fees incurred in connection with the Incident and or the preparation of the Agreement itself.

**Section 3.    Agreement is of Own Free Will.**

In executing this Release, ALNAMER hereby acknowledges that it is doing so freely, without deception or coercion, and is doing so with a full understanding of its rights. ALNAMER further acknowledges that it had the opportunity to seek legal advice from its attorneys. ALNAMER acknowledges that a lawsuit could have been filed. ALNAMER acknowledges that it did not have to accept this Agreement, but could have proceeded to file suit with a trial before a Judge or jury, and that it might have obtained more money or no money at all as a result of that trial. ALNAMER acknowledges that it is its judgment, based on its familiarity with its rights, and on advice of counsel, to accept this settlement.

4

M.A.

**Section 4.**    **Giving Up Right to Future Recovery.**

In executing this Release, ALNAMER acknowledges that it is forever giving up any right that it may have to recover any future damages or any other right of recovery as a result of the damages referenced herein, as against DYNAMIC arising out of the Incident. ALNAMER further understands that this is a Full and Final Release and that once it has been executed and the money paid over it will never have any right to further recovery or to reopen this matter to seek further damages from DYNAMIC in respect of the claimed Incident.

**Section 5.**    **Acknowledgment that Agreement is Fair.**

Based on the foregoing advice and its understanding of its rights, ALNAMER acknowledges that the consideration paid in settlement of this claim, under the circumstances, is adequate, sufficient and fair.

1.    ALNAMER KNOWS THAT THIS PAPER IS MUCH MORE THAN A RECEIPT. IT IS A RELEASE, AND ALNAMER KNOWS BY SIGNING THE SAME THEY ARE GIVING UP ALL RIGHTS AND CLAIMS THAT HAVE ARISEN OR MAY ARISE OUT OF THE INCIDENT ABOVE DESCRIBED AS AGAINST DYNAMIC.

2.    ALNAMER IS SIGNING THIS RELEASE BECAUSE OF THE VALUABLE CONSIDERATION IT WILL RECEIVE. ALNAMER HAS NOT BEEN PROMISED ANYTHING ELSE.

3.    ALNAMER IS SIGNING THIS RELEASE BECAUSE IT IS GETTING THE MONEY. ALNAMER HAS NOT BEEN PROMISED ANYTHING ELSE.

**Section 6.**    **Non-Admission of Liability.**

It is understood and agreed that this settlement is the compromise of disputed claims and that the consideration bargained for by all Parties shall not be an admission of liability and/or fault on the part of DYNAMIC and that DYNAMIC expressly denies all liability, fault and responsibility alleged and intends by way of this Agreement to avoid further expensive litigation.

M.A. ____

## Section 7.     Interpretation.

The undersigned Parties acknowledge that this Agreement was entered into after consultation with counsel and that each Party is executing it with full knowledge of its scope and meaning. The Parties have assisted and cooperated with the drafting of this Agreement and any ambiguity shall not be construed or interpreted against or in favor of any Party by virtue of the identity, interest or affiliation of its preparer.

## Section 8.     Governing Law.

This Agreement has been executed, delivered and shall be deemed to have been made in Michigan, and the validity, construction, and enforceability of this Agreement, as well as the rights and liabilities of the Parties hereto, shall be interpreted and determined in accordance with the laws of the State of Michigan and relevant federal statutes, and venue and jurisdiction is limited to the Wayne County Circuit Court without regard to any choice of law provisions, statutes or court rules.

## Section 9.     Confidentiality.

Except as otherwise provided in this Section, all the financial terms of this Agreement are strictly confidential and all Parties identified in this release shall keep all of the financial terms confidential and use all reasonable efforts to preserve the secrecy and confidentiality of the financial terms of this Agreement. A Party or Parties to this Agreement may, however, disclose those limited terms of this Agreement as necessary (1) to those of its officers, directors, agents or representatives who have a need to know such information; (2) to their attorneys, insurers, auditors, accountants and tax advisors, and immediate family members, as identified in this Release; and (3) as necessary to enforce this Agreement or as otherwise directed or ordered by a court of competent jurisdiction. The fact that this Agreement exists and that it contains a confidentiality provision is not confidential. To the extent any inquiry regarding this Agreement or the underlying

6

M.A.

litigation is addressed to the Parties, they will simply provide that there was a dispute between the Parties and it was satisfactorily resolved, without disclosing any financial terms or conditions of this Agreement. In the event any of the terms of this Agreement are disclosed under the circumstances permitted and described herein, the confidential nature of all the terms must also be disclosed.

In the event that a Party to this Agreement is required by law, regulation or court order to disclose any of the confidential information, that Party shall notify all the other Parties to this Agreement prior to disclosure so that the other Parties to this Agreement may have sufficient time to seek a protective order. In the event that no such protective order or other remedy is obtained, or the other non-disclosing Parties waive compliance with certain terms of this Agreement, the disclosing Party shall furnish only that portion of the confidential information which is required and will exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded to the confidential information so disclosed.

It is agreed by the parties that One Dollar ($1.00) from the settlement payment herein is designated as consideration for the confidentiality provisions set forth herein.

### Section 10.  Representations.

Mohamed Ahmed represents and warrants that he has authority to execute this Agreement on behalf of ALNAMER.

The Parties to this Agreement mutually warrant and represent that they have read and understood this Agreement and that this Agreement is executed voluntarily without duress or undue influence on the part of or on behalf of any Party hereto.  The Parties have had the opportunity to review this Agreement with counsel.

7

M.A.

**Section 11.    Successors.**

This Agreement shall be binding upon any successors of ALNAMER and such successors shall be deemed substituted for ALNAMER under the terms of this Agreement for all purposes.

This Agreement shall be binding upon and enure to the benefit of any successor(s) of DYNAMIC and such successor shall be deemed substituted for DYNAMIC.

**Section 12.    Headings.**

The paragraph and section headings in this Agreement are inserted merely for the convenience of reference only and shall not be used to construe, affect, or modify the terms of any paragraph or provision of this Agreement.

**Section 13.    Entire Agreement.**

This Agreement embodies the entire agreement and understanding of the Parties hereto with respect to the subject matter contained herein.   There are no promises, representations, warranties, covenants, conditions or undertakings, other than those expressly set forth or referred to herein.   No inducements to enter into this Agreement were made other than those explicitly spelled out in the terms herein.  This Agreement supersedes all prior agreements and understandings between the Parties concerning the Incident.

ALNAMER WHOLESALE

Dated: _____          By: _____

Mohamed Ahmed

6619411

8

M.A. _____

## WAREHOUSING AND STORAGE SERVICES AGREEMENT AND WAREHOUSE RECEIPT

This Warehousing Services Agreement and Warehouse Receipt (the "Agreement"), by and between FreshOne Foods LLC ("FUH" "FreshOne" or "Warehouseman"), each with their primary office located at 4001 Adler Drive, Ste 200, Dallas, Texas 75211, and _//Briner whichever_ [corporation limited liability company], with its primary

offices located at _____ ("Depositor" or "Client"), is dated and

effective as of _____ ("Effective Date") Warehouseman or Depositor may hereinafter each be referred to as a "Party" or collectively as the "Parties."

For and in consideration of the mutual covenants, terms, conditions, provisions and agreements herein contained, and other good and valuable consideration, the receipt, and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

**1. Term.** The term of this Agreement shall be two (2) years, commencing on the Effective Date (the "*Initial Term*"). The Agreement shall be automatically renewed for consecutive twelve (12) month periods at the end of the then current Term (each a "*Renewal Term*" and collectively with the Initial Term, the "*Term*"), unless either Party notifies the other Party in writing at least thirty (30), but not more than ninety (90) calendar days prior to the last day of the then current Initial Term or Renewal Term. Subject to the other provisions contained in this Agreement, the Parties will negotiate in good faith regarding the pricing and other financial terms of this Agreement to be in effect for each year during the Term of this Agreement, failing which, the then-existing pricing terms will remain in effect. The expiration or sooner termination of this Agreement shall not affect any rights or obligations arising prior to such expiration or sooner termination.

**2. Incorporation of Addenda.** This Agreement incorporates by reference all of the terms, conditions and provisions of the FreshOne Foods LLC Warehousing and Storage Services Addendum, which can be found at www.freshone.com/warehouse-and-storage-agreement as such may be modified by FreshOne from time to time in its sole discretion (the "Addendum") In the event of a conflict between the terms of this Agreement and the Addendum, the terms of this Agreement shall prevail 

**3. Warehousing Services To Be Provided By Warehouseman** (a) During the Term, FreshOne shall perform the services identified in Schedule A (the "Services") for the goods, products and other items as tendered by Client to FreshOne, as more particularly described on Schedule A (the "Goods"), which Schedule as such may be modified from time to time, by mutual agreement of the Parties, is attached hereto and incorporated herein by reference All Services shall be performed in a good and workmanlike manner, in accordance with industry standards, in full compliance with all applicable law and federal, state and local regulations. The Parties may include such special provisions relating to the Services, performance and/or respective obligations as may described on Schedule A, attached hereto and incorporated herein

(b) Where applicable, Client may provide its own Packaging Materials, including, but not limited to, cases, boxes, packing materials, and dry-ice or ice-packs, subject to approval and acceptance by FreshOne, or, with appropriate notice, can purchase Packaging Materials from FreshOne as per the price list on Schedule B FreshOne shall store Client's inventory of Packaging Materials in its possession in a safe and secure environment, shall keep the Packaging Materials free of damage.

(c) Where applicable, FreshOne shall maintain, store, and prepare all Products and Packaging Materials as necessary to service Client FreshOne shall examine all Products and Packaging Materials delivered to FreshOne, and if any Products or Packaging Materials are damaged or of unacceptable quality (each in accordance with best industry practices and Client's instructions and specifications), FreshOne shall reject any such Products or Packaging Materials and shall immediately notify Client of any delays this may cause FreshOne reserves the right to reject any Product or item it deems to be unfit for distribution in its sole discretion

(d) Any Products, that are required to be refrigerated, shall be stored by FreshOne in its cold-storage facilities and maintained at a temperature between 32 and 41 degrees Fahrenheit at all times

(e) Any Products that are required to be frozen shall be stored by FreshOne in its frozen-storage facilities and maintained at a temperature between 0 and -10 degrees Fahrenheit at all times, unless otherwise agreed between the Parties

**4. Indemnification** (a) Each Party (each an "*Indemnifying Party*") agrees to defend, indemnify, and hold

the other Party, its affiliates, members, managers, officers, employees, agents, and representatives (the "**Indemnified Party**") harmless from and against any and all threatened or actual claims, expenses, losses, causes of action, damages, or liabilities, including death or bodily injury (including reasonable attorneys' fees and court costs) (collectively, the "**Claims**") arising out of or in connection with an Indemnifying Party's or its respective affiliates, employees, officers, owners, agents, or representatives (i) responsibilities under this Agreement (ii) breach of any representation or warranty made herein (iii) violation of any law, rule, or regulation of any governmental agency, in each case except for the Indemnitee's gross negligence or willful misconduct.

(b) The Indemnified Party shall give the Indemnifying Party prompt written notice of any claim subject to indemnification; provided that the Indemnified Party's failure to promptly notify the Indemnifying Party shall not affect the Indemnifying Party's obligations hereunder except to the extent that the Indemnified Party's delay materially prejudices the Indemnifying Party's ability to defend such claim. The Indemnifying Party shall have the right to defend against any such claim with counsel of its own choosing and to settle such claim as the Indemnifying Party deems appropriate, provided that the Indemnifying Party shall not enter into any settlement that assesses blame against the Indemnified Party without the Indemnified Party's prior written consent. The Indemnified Party agrees to reasonably cooperate with the Indemnifying Party in the defense and settlement of any such claim, at the Indemnifying Party's expense.

     5.   **Limitation of Liability.** NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NEITHER PARTY SHALL IN ANY EVENT BE LIABLE IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, TO THE OTHER PARTY OR ITS RESPECTIVE SUBSIDIARIES, AFFILIATES, OR CUSTOMERS FOR ANY TYPE OF SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND, WHETHER FORESEEABLE OR UNFORESEEABLE, (SUCH AS, BUT NOT LIMITED TO, LOSS OF PROFITS OR BUSINESS OPPORTUNITY) ARISING FROM A PARTY'S PERFORMANCE OR FAILURE TO PERFORM UNDER ANY OF THE TERMS AND PROVISIONS OF THIS AGREEMENT OR OTHERWISE, INCLUDING WITHOUT LIMITATION, ANY SUCH DAMAGES ATTRIBUTABLE TO A BREACH OF ANY TERM OR PROVISION OF THIS AGREEMENT; PROVIDED, HOWEVER, THAT SUCH LIMITATION SHALL NOT BE APPLICABLE TO THE PAYMENT OF ANY FEES OWED BY CLIENT TO FRESHONE FOR SERVICES RENDERED.

CLIENT ACKNOWLEDGES AND AGREES THAT WAREHOUSEMAN IS NOT THE MANUFACTURER OR PRODUCER OF THE PRODUCTS STORED OR HANDLED BY WAREHOUSEMAN. IN NO EVENT SHALL WAREHOUSEMAN BE LIABLE WITH RESPECT TO ANY CONDITIONS, DEFECTS, DEFICIENCIES, DANGERS, FAULTS OR FAILURES OF ANY KIND IN OR RELATING TO ANY PRODUCTS STORED OR HANDLED BY WAREHOUSEMAN, WITH THE EXCEPTION OF DAMAGES ATTRIBUTABLE TO THE FAILURE OF WAREHOUSEMAN TO COMPLY WITH THE HANDLING, STORAGE AND TEMPERATURE REQUIREMENTS DESCRIBED IN THIS AGREEMENT.

**6. Exclusivity.**    During the Term and Extended Term of this Agreement, FreshOne shall be the exclusive provider of Services (or such services as may be substantially similar to the Services) to Client for any shipping destination that FreshOne can reach within three (3) days' time-in-transit, via ground service with any of its carriers or methodologies. For any shipments originating from FreshOne's facilities, Client shall use FreshOne's shipping accounts.

**7. Compensation.**    As full compensation for the services provided by FreshOne hereunder, Client shall pay to FreshOne the amounts, rates, and charges described in Schedule B, attached hereto and incorporated herein by reference, as such may be modified from time to time, as provided herein. Additionally, a cost-of-living adjustment equal to the increase (if any) in the US Consumer Price Index will be implemented by FreshOne annually from the date of the signed contract. The parties shall further conduct a pricing and operational review, not less than once per year, following which, Schedule B shall be modified to reflect the rates and charges to be paid by Client for FreshOne's services hereunder for the ensuing year, provided, however that, in the event that the Services provided by FreshOne to Client hereunder is modified from that which is identified on Schedule B, then the parties agree to promptly conduct a pricing review and modify the rates and charges to be paid by FreshOne for FreshOne's services until the next scheduled pricing and operational review hereunder. This agreement supersedes and replaces any and all previous rates and charges by FreshOne.

    8.   **Non-Solicitation of Employees.** During the Term or Extended Term of this Agreement and for the six (6) month period following the expiration or sooner termination of this Agreement, each party agrees it will not solicit, on its behalf or on behalf of any other natural person or entity, any employee of the other party, its subsidaries or affiliated companies, or in any manner attempt to influence or induce an employee to leave the employment of the other party. For the avoidance of doubt, either party shall have the right to hire employees of the other party when the applicable employee answers a general advertisement, responds to the posting of positions on the internet, or responds to any other general solicitation, when the applicable employee is referred by an employment agency that does not specifically target the employees of the other party, or such employee approaches a party without being solicited by a party. Notwithstanding anything to the contrary contained herein, each of the provisions of this Section 10 shall survive the expiration or sooner termination of this Agreement for the applicable period stated therein.

SCHEDULE A

SUPPLEMENTAL SERVICES

Services: FreshOne shall perform the following services and such related services as may be reasonably necessary to accomplish the services:

- Receipt and basic inspection of products and Packaging Materials and other materials to be stored by FreshOne as the client may request (must be scheduled 24 hours in advance).

- Storage of products and packaging materials, and other supplied goods (except as provided for in Section 2(c) and provided that the Client's account is in good standing:

- "Pick and Pack" at the Client's request, with orders to be sent no later than 72 hours of the day before shipping: or at agreed upon timing.

- Provides access to inventory reports and update inventory data as products and Packaging Materials are used, on a weekly basis;

—

SCHEDULE B

PRICING SCHEDULE

# Warehouse Storage-Pricing

| **Title/Description** | **Cost** | **Unit** |
| --- | --- | --- |
| Pallet Storage | $ 28.00 per month | |
| Handling In | $ 8.00 per pallet | |
| Handling Out | $ 8.00 per pallet | |
| Case Pick | $ 0.65 per pick | |

## Assumptions

- 250 average pallet spaces frozen per month
- Pallets turn an average of twice per month
- 2-year agreement
- Net21-day payment terms
- 48 hours' notice for inbound and outbound orders
- Pallet storage rates are not pro-rated i.e. (if pallets arrive on the 10th of the month, it is charged full month of storage)

FreshOne Foods LLC
Warehousing and Storage Services Addendum

The Warehousing and Storage Services Agreement and Warehouse Receipt (the "Agreement"), has been entered into by and between FreshOne Foods LLC, a Texas limited liability company, whose principal office address is 14180 Dallas Parkway, Suite 620, Dallas, Texas 75254 ("F1F" or "Company") and Customer, whose name and address are included on its Bill of Lading or other shipping documents (each a "Party" and, collectively, the "Parties"), as of the date of tender/delivery of Goods by Customer to F1F (the "Effective Date"). It is agreed and understood that, upon Customer's tender/delivery of Goods to F1F, Customer shall be deemed to have accepted this Agreement without modification oramendment (except as provided herein). It is further expressly acknowledged and agreed that the Agreement incorporates by reference all of the terms, conditions and provisions of this Addendum, which can be found at www.fresh-one.com warehouse-and-storage-agreement, as such may be modified by FreshOne from time to time in its sole discretion (the "Addendum"). Accordingly, in consideration of F1F's acceptance of such tender/delivery by Customer, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the following terms and conditions of the warehousing and storage services provided by F1F to Customer as follows:

1. It is expressly understood that this Warehouse Receipt does not cover or apply to any rights, obligations, terms or conditions of the freight forwarding, customs brokerage, or other services that Company has provided or may provide to the Customer.

2. Definitions. As used in this Agreement:

a. "Customer" means the person, company, firm, or other entity for whom the Goods are stored and the services contemplated hereby are provided, as identified on the Bill of Lading relating to the Goods tendered by such Customer; and,
b. "Goods" means the property tendered to Company by Customer for which Company has agreed to store pursuant to this Agreement.

3. Ownership of Goods. Customer warrants that it is the lawful owner and/or has lawful possession of the Goods tendered for storage. Customer warrants that it has sole legal rights to store Goods tendered, to release Goods, and to instruct Company regarding delivery or disposition of the Goods. Customer agrees to notify all parties acquiring any interest in the Goods of the terms and conditions of this Agreement and further agrees to indemnify and hold Company harmless from any claim by third parties relating to the ownership, storage, handling or delivery of Goods, or from any other services provided by Company under this Agreement. Such indemnification shall include any legal fees or costs incurred from any claim by a third party, regardless of whether or not litigation is actually filed.

4. Storage.
a. Company agrees to receive, store, and release the Goods in accordance with Customer's reasonable instructions and subject to the terms, conditions and provisions of this Agreement.
b. Customer agrees that all Goods must be stored on pallets consisting of single SKUs unless the pallet is being delivered and released as a single unit. Any Goods being delivered with the intent for F1F to provide pick & pack, direct-to-customer, or other services must be separated onto single SKU pallets.
c. If Company determines that the original palletization of Goods must be broken down for storage purposes, Company shall be authorized to break down the pallets without further notice required to Customer.
d. Company may provide additional services to Customer as requested and as agreed. Additional charges for those services will be agreed upon with Customer and will be invoiced to Customer in addition to any storage charges due.

5. Termination of Storage. Company reserves the right to terminate storage and to require the removal of the Goods, or any portion thereof, by giving Customer thirty (30) days advance written notice. Customer shall be responsible for payment of all charges attributable to said Goods within the stated period and for removing the Goods from the warehouse upon payment of all charges. If the Goods are not so removed, Company may exercise its rights under applicable law including but not limited to selling the Goods.

6. Customer's Warranties and Tender for Storage
a. Customer warrants that the Goods are properly marked, packaged, labeled and classified for handling and are fit for the safe and proper warehousing, handling, storage and transportation contemplated under this Agreement, all in accordance with applicable law, regulation or industry standard. Customer shall supply such information and documents as are necessary to comply with all applicable laws, rules and regulations. Company will not accept Goods

that are not properly packaged or which, in the reasonable opinion of Company, are not suitable for movement or storage within the warehouse or for transportation in accordance with applicable laws, rule and regulations.

b.    Customer shall furnish, prior to or upon delivery of the Goods to Company, a manifest showing marks, brands or sizes to be accounted for separately and the class of storage desired, if applicable.

c.    Hazardous Materials. Customer warrants that the Goods are not considered hazardous materials and or dangerous goods at the time the Goods are tendered to Company. Customer warrants that the Goods shall be limited to the permissible materials and quantities described in the then-current and applicable federal, state and local regulations, and shall properly and accurately describe the Goods, and provide Company with all necessary or useful information for the safe storage and handling of the Goods, including but not limited to, whenever applicable, Material Safety Data Sheets and or Product Safety Data Sheets. If Customer breaches any of the foregoing warranties related to tender of hazardous materials or dangerous goods, or otherwise delivers any unfit Goods to Company, Company shall be entitled to exercise all available remedies including the immediate destruction or removal of the Goods from the warehouse without notice to Customer. In the event of the foregoing breach of any Customer warranties, Customer shall be liable for all expenses costs, losses, damages (including consequential and compensatory damages), fines, penalties or other expenses of any sort incurred by Company in connection with the removal, or destruction, or handling of the Goods and shall indemnify Company from and against all amounts, liabilities, claims, or damages arising in connection with the Goods.

d.    Customer warrants its compliance with all applicable laws, rules, and regulations in respect of the Goods and the services requested to be performed by Company, including but not limited to customs laws, import and export laws, as well as with the U.S. Foreign Corrupt Practices Act and similar laws related to anti-corruption and anti-bribery.

7.  Payment Terms & Collection Expenses. Company shall issue monthly invoices to Customer for warehousing and storage services provided to Customer, which shall be due and payable within 14 days of the invoice date unless otherwise agreed by the Parties in writing. All invoices not paid by the due date will be subject to a late fee of 2% per month, or the maximum rate then allowable under applicable law. If it becomes necessary for Company to utilize a collection agency and or an attorney to collect any unpaid amount owed or to assist in effectuating the lien provisions herein, Customer shall be obligated to pay all costs of collection, including without limitation agency fees, attorneys fees, court costs and other reasonably incurred expenses.

8.  Lien Rights. F1F will be considered a warehouseman as described in Article 7 of the Uniform Commercial Code ("UCC"), as adopted in the State of Texas, and shall be entitled to all rights and subject to all obligations described therein. Company shall have, and Customer hereby grants to Company, a warehouseman's lien on any and all Goods tendered by Customer and upon any and all property belonging to Customer in Company's possession, custody or control, and upon the proceeds from the sale thereof, for all charges, advances or amounts of any kind due to Company or its affiliates under this Agreement or under any prior or subsequent invoices issued to Customer by Company or its affiliates (including charges for storage, handling, transportation, demurrage, terminal charges, insurance, labor, and any other charges incurred). Company may refuse to surrender possession of the Goods until all charges or debtsare paid in full. If such amounts remain unpaid for 30 days after Company's demand for payment (or as otherwise required under applicable law), Company may sell the Goods at public auction or private sale or in any other mannerreasonable, and shall apply the proceeds of such sale to the amounts owed. Customer shall remain responsible for anyfinancial deficiency outstanding to Company.

a.    Company shall not be liable for any loss of, destruction of, or damage to the Goods, however caused, unless such loss, damage or destruction resulted from Company's gross negligence while the Goods are in its care and possession. Company shall not be liable for damages which could not have been avoided in undertaking its exercise of such care.

b.    In no event shall Company be liable for any loss or damage caused by:

i.    acts of God, public authorities acting with actual or apparent authority, disease, virus or infection, strikes, labor disputes, weather, mechanical or equipment failures, cyber-attacks, civil commotions or disturbances, hazards incident to a state of war, acts of terrorism, acts or omissions of customs or quarantine officials, acts of carriers related to security, the nature of the freight or any defects thereof, inherent vice of the goods, perishable qualities of the merchandise, fires, frost or change of weather, sprinkler leakage, floods, wind, storm, moths, insects or other varmints, public enemies, or other causes beyond its control;

ii.   fragile articles that are damaged or broken, unless packed by Company's employees and unpacked by them at the time of delivery;

iii.     pilferage or theft, unless such loss or damage is caused by the failure of Company to exercise such ordinary care required by law; or,

iv.     concealed or latent damage, or losses incurred due to the concealed or latent damage of the Goods.

c.     Limitation of Liability: In the event of loss or damage to the Goods for which Company is liable, Company's maximum liability shall be limited to the actual value of the Goods, subject to a maximum of USD $.50 per pound of goods stored, unless: i) Customer declared in writing a higher value of the goods at the time of tender; ii) Company agreed in writing to such value and to purchase insurance for Customer's benefit in respect of the Goods so tendered; and, iii) Customer has paid Company the supplementary charge in accordance with the terms so described.

d.     In no event shall Company be responsible for loss or damage to documents, stamps, securities, artwork, heirlooms, jewelry or other articles of high and unusual value unless a special and specific agreement in writing is made between Company and Customer with respect to such articles.

e.     No Consequential Damages. IN NO EVENT, WHETHER AS A RESULT OF COMPANY'S DUTIES, NEGLIGENCE, LIABILITY WITHOUT FAULT OR ANY OTHER LEGAL THEORY OR BASIS, SHALL COMPANY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, STATUTORY OR PUNITIVE DAMAGES, INCLUDING BUT NOT LIMITED TO CUSTOMER'S LOSS OF PROFITS, USE, MARKET VALUE OR INCOME IN RESPECT OF THE GOODS, ATTORNEYS FEES, WRONGFUL OR DELAYED DELIVERY OR FAILURE TO ATTEMPT DELIVERY, OR DAMAGE TO PROPERTY, OR THE COST OF SUBSITUTED GOODS, WHETHER OR NOT COMPANY HAD KNOWLEDGE THAT SUCH DAMAGES OR LOSSES MIGHT OCCUR.

9.     Insurance.

a.     Prior to or concurrently with the initial tender of Goods by Customer to Company (and not less than annually thereafter), each Party will deliver (for purposes of this Section, the "Delivering Party") to the other Party (for purposes of this Section, the "Receiving Party") with certificates of insurance (and/or such other evidence as a Party may reasonably request) that the following insurance coverages are in force on behalf of the Delivering Party: i) comprehensive general liability insurance reflecting minimum coverage as follows: i) $1,000,000 for each occurrence/$2,000,000 in the aggregate for bodily injury; and $500,000 per occurrence $2,000,000 in the aggregate for property damage; ii) Commercial Auto Liability insurance with limits of $1,000,000 per occurrence for Bodily Injury and Property Damage. Such insurance will apply to both owned and non-owned vehicles; iii) Workers' Compensation insurance covering the Delivering Party's obligations under all applicable laws and Employers Liability insurance in the amount of $500,000 per occurrence; and, iv) Umbrella Excess Liability insurance in the amount of $5,000,000.

All policies of insurance (and such certificates of insurance) will: x) name the Receiving Party as an additional insured (except Workers Compensation); y) provide for waiver of underwriters rights of subrogation against the Receiving Party; and, z) provide that such coverage may not be canceled or altered except upon not less than 30 days prior written notice being given to Receiving Party.

b.     Customer acknowledges that the storage rates and charges billed to Customer do not include any insurance on the Goods beyond the coverage detailed in paragraph 9a of this Agreement. Customer may request that the Company obtain additional insurance for the Customer's benefit; provided that the Customer pays the required premium to Company for such additional insurance. Except as provided above, Company will not obtain additional insurance on the Goods for Customer's benefit while the Goods are being stored at Company's facility.

10. Company will not be responsible for losses or damages incurred to Perishable Goods beyond their expiration date.

11. Inspection & Security. All shipments are subject to inspection by Company or Company's Carriers for any transportation services provided, if any, and by any duly authorized government or regulatory entities, including but not limited to the U.S. Transportation Security Administration and U.S. Customs and Border Protection. Notwithstanding the foregoing right to inspect shipments, Company is not obligated to perform any inspections except as mandated by law. Further, Company reserves the right to unilaterally reject any shipment that it deems unfit for transport, or for storage under this Agreement, after inspection.

12. Default and Termination.

(a)     Notwithstanding the Term, FreshOne shall have the right to terminate this Agreement, without penalty, as follows:

(i)     Client's insolvency, liquidation, or if Client has a receiver appointed for any of its assets;

(ii)    Client's failure to maintain its account in good standing, by allowing its invoices to age more than 60 days past due; or,

(iii)    Client's breach of this Agreement and a failure to cure such breach (or be diligently proceeding to effect a cure) within 30 days of written notice from FreshOne specifying such breach.

(b)    Notwithstanding the Term, Client shall have the right to terminate this Agreement, without penalty, as follows:

(i)    FreshOne's material breach of this Agreement and a failure to cure such breach (or be diligently proceeding to effect a cure) within 30 days of written notice from Client specifying such breach; or,

(ii)    FreshOne's insolvency, liquidation, or if FreshOne has a receiver appointed for any of its assets.

(c)    Upon any expiration or termination of this Agreement, provided that Client's account is paid in full, FreshOne will promptly deliver to Client all of Client's Products and Packaging Materials in FreshOne's possession or control, and shall continue to comply with this Agreement until such items have been returned to Client. The provisions of Sections 2, 4, 5 and 8 of the Agreement and Sections 3, 5, 7, 8, 9, 10, 12, 13, 14, 15 and 16 of this Addendum shall survive any termination of expiration of this Agreement.

13.    Notice of Claim and Filing of Suit.

a.    Company shall not be liable for any claim whatsoever for any loss, damage, or destruction of the Goods unless it is timely filed, in writing, within a maximum of sixty (60) days after Customer knew or should have known by the exercise of reasonable care of such loss or damage.

b.    Any lawsuit or other claim against Company with respect to the Goods shall be forever waived unless commenced within one year after Customer knew or should have known by the exercise of reasonable care about such loss or damage.

14. Notices. All written notices herein may be transmitted by any commercially reasonable means of communication providing delivery receipt to the sender, and shall be directed to Company at the address listed above and to Customer at the address provided by the Customer for billing, unless otherwise instructed by either Party in writing.

15. Governing Law. This Agreement shall be governed by the laws of the State of Texas, without reference to its conflict of laws principles.

16. Merger; Waiver; Severability. This Agreement, including any agreement into which this Agreement may be incorporated by reference, constitutes the entire understanding between Customer and Company regarding the storage of the Goods and services provided and, as such or so incorporated, supersedes all prior or contemporaneous verbal or written negotiations, statements, representations, or agreements. In the event of a conflict between the terms of this Agreement and the Addendum, the terms of the Agreement shall prevail.

17. This Agreement may not be modified except for a written agreement between Customer and an officer of Company. If any section or portion of this Agreement is held by any court to be illegal or unenforceable it shall not affect the legality or enforceability of the remaining provisions or terms and conditions herein. Company's failure to insist upon strict compliance with any provision of this Agreement shall not constitute a waiver or estoppel to later demand strict compliance thereof nor to insist upon strict compliance with all other provisions of this Agreement.

18. Headings Not Binding. The use of headings in this Agreement are for ease of reference only. Headings shall have no effect and are not considered to be part of or a term of these Terms and Conditions.

